IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------- x
In re:                                :  Chapter 11 Case No.
                                      :  Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                :  Jointly Administered
HOLDINGS, INC., a Delaware            :
corporation, et al.,                  :
                                      :
                 Debtors.             :
------------------------------------- x
WELLS FARGO BANK, N.A., in its        :
capacity as Securities Administrator  :
                                      :
                 Plaintiff,           :
                                      :
        v.                            :
                                      :  Adv. Proc. No. 07-51741 (CSS)
AMERICAN HOME MORTGAGE INVESTMENT     :
CORP., AMERICAN HOME MORTGAGE         :
ACCEPTANCE, INC., BEAR STEARNS        :
MORTGAGE CAPITAL CORP., BEAR, STEARNS :
& CO. INC., BEAR STEARNS INTERNATIONAL:
LIMITED, and STRATEGIC MORTGAGE       :
OPPORTUNITIES, REIT, INC.,            :
                                      :
                 Defendants.          :
------------------------------------- x
```

**OPENING BRIEF IN SUPPORT OF MOTION OF DEFENDANTS AMERICAN HOME
MORTGAGE INVESTMENT CORP. AND AMERICAN HOME MORTGAGE ACCEPTANCE,
INC., PURSUANT TO 11 U.S.C. § 105(a) AND FED. R. BANKR. P. 7056,
FOR ENTRY OF AN ORDER (I) GRANTING SUMMARY JUDGMENT IN FAVOR OF
AMERICAN HOME DEFENDANTS AND AGAINST BEAR ENTITIES WITH RESPECT
TO INTERPLEADER COMPLAINT AND (II) DIRECTING WELLS FARGO BANK,
N.A. TO DISTRIBUTE TO AMERICAN HOME MORTGAGE INVESTMENT CORP.
THE AUGUST 2007 PRINCIPAL AND INTEREST PAYABLE WITH RESPECT
TO THE SERIES 2006-3 TRUST CERTIFICATE**

**TABLE OF CONTENTS**

Page

I.   PRELIMINARY STATEMENT........................................1

II.  FACTUAL BACKGROUND...........................................4

     A.   AHMIC Investment Portfolio............................4

     B.   AHMI Trust Issues Trust Certificate To AHMIC..........5

     C.   Terms Of Trust Documents..............................6

     D.   AHMIC Sells Trust Certificate To BSIL Under BSIL
          Repo Agreement; Trust Certificate Is Transferred
          "In Blank" To BSIL...................................10

     E.   BSIL Terminates BSIL Repo Agreement And Sells
          Trust Certificate To Affiliate SMOREIT; SMOREIT
          Fails To Register Trust Certificate Prior To
          August Record Date...................................14

     F.   Bear Entities Demand August Payment..................17

III. ARGUMENT....................................................18

     A.   Summary Judgment Standard............................18

     B.   Material Facts Are Not In Dispute....................19

     C.   Documents Unambiguously Direct Wells Fargo To Make
          August Payment To Certificateholder On August
          Record Date -- AHMIC.................................21

     D.   Bear Entities Failed To Secure Protections That
          Similarly Situated Repo-Counterparties Obtain........24

     E.   Policy Considerations Militate Strongly In Favor
          Of Strictly Preserving Sanctity Of Record Date
          Provisions...........................................26

IV.  CONCLUSION..................................................28

**TABLE OF AUTHORITIES**

**Page**

**CASES**

Celotex Corp. v. Catrett,
     477 U.S. 317 (1986).................................... 19

In re Bashford's Estate,
     178 Misc. 951, 36 N.Y.S. 2d 651 (1942)................. 27

Indemnity Ins. Co. of North America v. Integrated Health
     Svcs., Inc.,
     375 B.R. 730 (D. Del. 2007)........................... 19

Jamie Sec. Co. v. The Limited, Inc.,
     880 F.2d 1572 (2d Cir. 1989).......................... 26

Matsushita Elec. Indus. Co. V. Zenith Radio,
     475 U.S. 574 (1986)................................... 19

Ruei Chan v. Pierce,
     2004 WL 2072460 (S.D.N.Y. 2004)....................... 26

U.S. Trust Co. of New York v. Alpert,
     10 F. Supp. 2d 290 (S.D.N.Y. 1998).................... 26

**STATUTES**

11 U.S.C. § 105(a)........................................... 1

Fed. R. Bankr. P. 7056.................................... 1, 18

Fed. R. Civ. P. 56.......................................... 18

Internal Revenue Code § 856(a)............................. 10

Internal Revenue Code § 856(i)............................. 10

American Home Mortgage Investment Corp. and American Home Mortgage Acceptance, Inc. (the **"American Home Defendants"**) submit this opening brief in support of their Motion, Pursuant To 11 U.S.C. § 105(a) And Fed. R. Bankr. P. 7056, For Entry Of An Order (I) Granting Summary Judgment In Favor Of American Home Defendants And Against Bear Entities With Respect To Interpleader Complaint And (II) Directing Wells Fargo Bank, N.A. To Distribute To American Home Mortgage Investment Corp. The August 2007 Principal And Interest Payable With Respect To The Series 2006-3 Trust Certificate (the **"Motion"**), and, in support thereof, respectfully state as follows:

## I.   PRELIMINARY STATEMENT

This proceeding presents a simple, straightforward exercise in contract interpretation concerning the proper recipient of a single monthly distribution of principal and interest that was payable on a trust certificate for the month of August 2007. Competing claims to this August Payment asserted by AHMIC and the Bear Entities prompted Wells Fargo, the trust's Certificate Registrar, to commence the instant interpleader action.

The relevant documents provide unambiguously that AHMIC, the Certificateholder identified in the Certificate Register on the Record Date for the August Payment (i.e., the August Record Date), is entitled to the August Payment.  The Bear Entities

1

purport to have a superior right to the August Payment because
AHMIC sold the Trust Certificate to BSIL under the BSIL Repo
Agreement, and BSIL terminated the BSIL Repo Agreement,
thereafter selling the certificate to its affiliate SMOREIT.[1]
But SMOREIT failed to register itself as the owner of the Trust
Certificate in the Certificate Register prior to the August
Record Date.  Having failed to do so timely (*i.e.*, before the
August Record Date), SMOREIT is not entitled to the August
Payment.

- **_Material Facts Are Undisputed._**  The pleadings, interrogatory
  responses, documents produced and deposition testimony
  demonstrate that the facts material to resolving competing
  claims to the August Payment are not in dispute:

  - On May 1, 2007, AHMIC sold the Trust Certificate to
    BSIL under the BSIL Repo Agreement without the
    Certificateholder's rights to income distributions.
    AHMIC and BSIL transferred the Trust Certificate "in
    blank," that is, leaving blank the transferee's
    identity in the transfer documents.[2]

  - While BSIL took physical possession of the Trust
    Certificate, AHMIC continued to be the
    Certificateholder listed in the Certificate Register,

---

[1]  American Home disputes that (a) AHMIC breached the BSIL Repo
Agreement, (b) AHMIC was in default under the agreement, and
(c) the agreement was properly terminated.  It expressly
reserves any and all rights, claims, and defenses with
respect to the same, and nothing herein should be construed
as an admission or waiver with respect thereto.

[2]  The Trust Documents require the holder of the Trust
Certificate to be a qualified REIT (real estate investment
trust).  While AHMIC is a REIT, BSIL is not a REIT and, at
that time, did not have a REIT affiliate capable of owning
the Trust Certificate.

which is the only entity entitled to receive income distributions. From May 2007 through July 2007, AHMIC continued to receive and retain principal and interest distributions, and its entitlement to those distributions is not disputed.

- August 31, 2007 constitutes the Record Date for the August Payment. AHMIC was the Certificateholder listed in the Certificate Register on that date.

- On or about August 3, 2007, BSIL terminated the BSIL Repo Agreement, and, on or about August 10, 2007, BSIL sold the Trust Certificate to its affiliate SMOREIT. But SMOREIT failed to promptly register itself as the Certificateholder in the Certificate Register because of a "clerical error." In fact, SMOREIT did not register the Trust Certificate until September 28, 2007, nearly thirty days after the August Record Date.

- ***Trust Documents Are Unambiguous.*** The Trust Documents unambiguously direct Wells Fargo (the Certificate Registrar) to make the August Payment to AHMIC as the Certificateholder on the August Record Date: (a) they limit distributions to the Certificateholder identified in the Certificate Register on the applicable Record Date, (b) SMOREIT's failure to register its interest in the Certificate Register prior to the August Record Date prevents it from qualifying as a Certificateholder for purposes of the August Payment and (c) with respect to a "transferee" of a Trust Certificate like SMOREIT, distributions are made to the existing registered Certificateholder (i.e., the transferor) unless the transferee registers its interest in the Certificate Register before the next Record Date. Indeed, the Trust Documents specifically contemplate the facts presented -- i.e., a transferee that fails to register its ownership interest before the applicable Record Date -- and authorize the Certificate Registrar in that instance (i) to treat the Certificateholder identified in the Certificate Register as the "owner" for ***all*** purposes, including the receipt of distributions, and (ii) to ignore notices of purported ownership interests from entities not in the Certificate Register.

- ***Integrity Of Record Dates Must Be Preserved.*** The important role record dates play in aiding a trustee's administrative duties provides an additional justification for limiting entitlement to the August Payment to the registered Certificateholders on the Record Date. Record dates fix

3

with certainty the identities of distribution recipients, protect the trustee, and ease administration.  Distributing the August Payment to SMOREIT would needlessly undermine their significance.

## II.  FACTUAL BACKGROUND

A.  AHMIC INVESTMENT PORTFOLIO

Prior to filing its bankruptcy cases, American Home Mortgage Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, "**American Home**") -- in addition to originating, selling and servicing mortgage loans -- invested directly in mortgage-backed securities.  Defendant American Home Investment Corp. ("**AHMIC**") is a real estate investment trust ("**REIT**") that, _inter alia_, invested in mortgage-backed securities issued by its affiliates.  AHMIC financed that investment with funds its lenders advanced under repurchase agreements, pursuant to which AHMIC sold the securities to its repo-lenders and agreed to repurchase them on a later date.  One such agreement was the BSIL Repo Agreement among AHMIC and Defendant Bear Stearns International Limited ("**BSIL**").[3]

---

[3]  The Global Master Repurchase Agreement among Bear Stearns International Limited and AHMIC, dated October 28, 2004 (the "**BSIL Repo Agreement**") (WEL-AHM0000654-WEL-AHM0000698), annexed as Exhibit 1.  All exhibits referenced herein are attached to the Declaration Of James C. Tecce In Support Of The Motion (the "**Tecce Declaration**").

**B.   AHMI TRUST ISSUES TRUST CERTIFICATE TO AHMIC**

On December 28, 2006, as part of American Home's residential securitization program, American Home Mortgage Securities LLC ("**AHMSLLC**") deposited certain mortgage loans originated by American Home Mortgage Acceptance, Inc. ("**AHMA**") and its affiliates into the American Home Mortgage Investment Trust 2006-3 ("**AHMI Trust**").[4] The AHMI Trust issued a series of trust certificates (Series 2006-3) pursuant to that certain Amended and Restated Trust Agreement, dated as of December 28, 2006 (the "**Trust Agreement**").[5] The Trust Certificate that is the subject of this proceeding[6] was issued by the AHMI Trust pursuant to the

---

[4] American Home's Answer to Wells Fargo's Interpleader Complaint, dated December 11, 2007 (hereinafter, the "**American Home Answer**"), at pp. 6-7 (¶16), annexed hereto as Exhibit 2.

[5] A copy of the Trust Agreement (AHM-BS-0000001 - AHM-BS-0000084) is annexed hereto as Exhibit 3. The AHMI Trust also issued notes pursuant to that certain Indenture, dated as of December 28, 2006, between AHMI Trust, Deutsche Bank National Trust Company, as indenture trustee, and Wells Fargo as securities administrator (the "**Indenture**"). Relevant excerpts of the Indenture (AHM-BS-0000085 - AHM-BS-0000389) are annexed hereto as Exhibit 4.

[6] The "**Trust Certificate**" (BSIL000100 - BSIL000111), CUSIP No. 026929BS7.  The Trust Certificate also consists of several exhibits (BSIL000115 - BSIL000139), including form Transferor and Transferee Certificates, Distribution instructions, and form Rule 144A Investment Representation.  The Trust Certificate (with its attached exhibits) is annexed hereto as Exhibit 5.  See also Deposition of Bear Entities' Rule 30(b)(6) Witness, dated June 4, 2008 (the "**McCrink Dep.**"), at
Footnote continued.

Trust Agreement (with the Trust Certificate, the "**Trust Documents**").  It represents a 100% fractional, undivided interest in the AHMI Trust.

The AHMIC Trust issued AHMIC the Trust Certificate on December 28, 2006 (when the trust was formed).  On the same date, AHMIC timely and appropriately registered its interest with the Certificate Registrar (as defined below) in the Certificate Register (as defined below).[7]  Thereafter, AHMIC received monthly principal and interest distributions paid on the Trust Certificate for the months between January 2007 and July 2007.

C.   TERMS OF TRUST DOCUMENTS

The Trust Agreement provides that monthly principal and interest distributions must be made to the current "Certificateholder" of record on the "Record Date."  See Ex. 3 (Trust Agreement) at p. 19 (§ 5.02) (AHM-BS-0000024) (stating "distributions required to be made to the Certificateholder on any Payment Date ... *shall be made to the Certificateholder of record on the preceding record date*") (emphasis added).  Under the Trust Agreement, the "Certificateholder" is defined to mean

---

pp. 39:12-41:5; 45:6 - 46:24 (identifying the Trust Certificate and its exhibits), annexed hereto as Exhibit 6.

[7]   Ex. 5 (Trust Certificate) at BSIL000100 (identifying American Home as registered Certificateholder as of December 28, 2006).

the registered owner of the Trust Certificate, specifically "*the Person in whose name the Certificate is registered in the Certificate Register.*"[8]

The Trust Certificate contains similar instructions with respect to distributing principal and interest payments:

> **There will be distributed on the 25th day of each month** or, if such 25th day is not a Business Day, the next Business Day (each, a 'Payment Date'), commencing on December 26, 2006, **to the Person in whose name this Certificate is Registered at the close of business on the last Business Day of the month immediately preceding such Payment Date (the 'Record Date'),** such Certificateholder's Percentage Interest in the amount to be distributed to Certificateholders on such Payment Date.[9]

It also (a) directs the Certificate Registrar to look to the Certificate Register in determining the appropriate recipients of principal and interest distributions and (b) authorizes it to

---

[8]   Ex. 3 (Trust Agreement) at p. 2 (§ 1.01) (AHM-BS-0000007) (emphasis added) (incorporating Indenture definitions by reference); Ex. 4 (Indenture) at Appendix p. 6 (AHM-BS-0000337) (defining Certificateholder) (emphasis added), at Appendix p. 6 (AHM-BS-0000337) (defining **"Certificate Register"** to mean "[t]he register maintained by the Certificate Registrar in which the Certificate Registrar shall provide for the registration of Certificates and of transfers and exchanges of Certificates"), at Appendix p. 6 (AHM-BS-0000337) (defining **"Certificate Registrar"** to mean "[i]nitially, the Securities Administrator, in its capacity as Certificate Registrar, or any successor to the Securities Administrator").

[9]   Ex. 5 (Trust Certificate) at BSIL000103 (emphasis added). The terms **"Payment Date"** and **"Record Date"** mean (respectively) (a) the "25th day of each month ..." and (b) "the last Business Day of the calendar month preceding such Payment Date." See Ex. 4 (Indenture) at Appendix p. 45 (AHM-BS-0000376), at Appendix p. 47 (AHM-BS-0000378).

disregard notices of alleged ownership interests that are not corroborated by the Certificate Register. See, e.g., Ex. 5 (Trust Certificate) at BSIL000108 (" [T]he Certificate Registrar ... may treat the Person in whose name this Certificate is registered **as the owner hereof for all purposes,** and none of the Owner Trustee, the Certificate Paying Agent, the Certificate Registrar or any such agent **shall be affected by any notice to the contrary**") (emphasis added).

While Trust Certificates are transferable, a transferee only becomes entitled to the principal and interest distributions when it registers its interest with the Certificate Registrar -- hence satisfying the Certificateholder definition. See Ex. 3 (Trust Agreement) at p.9 (§ 3.03) (AHM-BS-0000014) ("A transferee of a Certificate **shall become a Certificateholder and shall be entitled to the rights and subject to the obligations of a Certificateholder hereunder** upon such transferee's acceptance of a Certificate **duly registered in such transferee's name** pursuant to and upon satisfaction of the conditions set forth in Section 3.05 ['Registration of and Limitations on Transfer and Exchange of Certificate']") (emphasis added).

Critically, the Trust Agreement contemplates that after a Trust Certificate is transferred -- but before the transferee registers its ownership interest -- the Certificate Registrar may make distributions to the existing Certificateholder (i.e., the

8

entity then-listed in the Certificate Register) instead of the transferee.  Again, the agreement authorizes the Certificate Registrar to disregard notices from entities that claim ownership interests but do not appear in the Certificate Register.  See Ex. 3 (Trust Agreement) at p. 12 (§3.07) (AHM-BS-0000017) (**"Prior to due presentation of a Certificate for registration of transfer ... the Certificate Registrar ... may treat the Person in whose name the Certificate is registered in the Certificate Register as the owner of such Certificate for the purpose of receiving distributions ... [and] the Certificate Registrar ... shall [not] be bound by any notice to the contrary"**) (emphasis added).

When the Trust Certificate is transferred, documents executed to effectuate the transaction include:

- a **"Bond Power"** designed to make the Trust Certificate "negotiable," which states the original owner "does hereby assign and transfer unto [Transferee] 100% Percentage Interest of the American Home Mortgage Investment Trust 2006-3 ... Owner Trust Certificate, issued December 28, 2006 ... and all rights thereunder[;]"[10]

---

[10]  See BSIL000112 (the Bond Power), a copy of which is annexed hereto as Exhibit 7.  See also Ex. 6 (McCrink Dep.) at p. 32:2-5 ("[reviewing form bond power annexed to Trust Certificate at BSIL000112]:  "this looks like a bond power which would be the form that would be used to transfer a security"), at p. 35:9-14 ("What this bond power is is a form where American Home has signed it that this is -- this is an endorsement form so that in its current form Bear Stearns looked at this and said that this was adequate form for this security to be fully negotiable"); p. 46:19-24 (reviewing Bond Power:  "These were the documents that Bear Stearns received to the bond power to make the trust certificate
Footnote continued.

- a "**Transferee Certificate**" (a form of which was attached to the Trust Certificate) pursuant to which the Transferee certifies that following the transfer it will "own ... the Trust Certificate."[11]

- a "**Certificate Of REIT Status**" (a form of which was attached to the Trust Certificate) pursuant to which the transferee certifies, represents and warrants that "[t]he Transferee is a REIT or a Qualified REIT Subsidiary within the meaning of Section 856(a) or Section 856(i) of the [Internal Revenue] Code ..."[12]

The Trust Certificate provides that (a) it can only be held by a REIT and (b) unless the holder (as a transferee or otherwise) is a REIT, it cannot qualify as a Certificateholder.[13]

### D.    AHMIC Sells Trust Certificate To BSIL Under BSIL Repo Agreement; Trust Certificate Is Transferred "In Blank" To BSIL

On May 1, 2007, AHMIC sold the Trust Certificate to BSIL under the BSIL Repo Agreement.[14]  On or about the same date, BSIL

---

negotiable. So I guess they become -- they are not part of the trust certificate, but they are part of the package required to make it negotiable").

[11]  Ex. 5 (Trust Certificate) at BSIL000133.

[12]  Ex. 5 (Trust Certificate) at BSIL000138.

[13]  Ex. 5 (Trust Certificate) at BSIL000101 ("NO TRANSFER OF THIS CERTIFICATE SHALL BE MADE UNLESS THE CERTIFICATE REGISTRAR HAS RECEIVED PROOF OF THE TRANSFEREE'S STATUS AS A REIT OR AS A QUALIFIED REIT SUBSIDIARY ..."); at BSIL000105 ("No person shall become a Certificateholder, so long as any Notes are Outstanding, until it shall establish its status as a real estate investment trust or as a qualified REIT subsidiary").

[14]  See BSIL 000061, the Transaction Confirmation, a copy of which is annexed hereto as Exhibit 8; Ex. 6 (McCrink Dep.) at p. 20:9-12 (identifying document as "a trade confirmation
Footnote continued.

10

took physical possession of the Trust Certificate.[15]

AHMIC and BSIL transferred the Trust Certificate "in blank."[16]  This meant the Trust Certificate would not be registered in BSIL's name as the buyer or transferee at the time of the transfer (even though AHMIC was selling the Trust Certificate to BSIL under the BSIL Repo Agreement).  Instead, the provisions in the transfer documents (e.g., the Bond Power, the Transferee Certificate, and the Certificate of REIT Status) that identify the transferee to whom the Trust Certificate was being transferred were "left blank."[17]

---

which is sent to American Home documenting the purchase of the American Home trust certificate 2006-3").

[15]  See Ex. 6 (McCrink Dep.) at p. 26:17-23 ("[Q] Did Bear Stearns in fact receive the trust certificate on May 1?   [A] Yes, presumably, yes, Bear Stearns might have gotten the trust certificate the day before, but the trade wasn't executed this date, probably they got it May 1 ..."), at pp. 29:25-30:4 (identifying Trust Certificate, with exhibits, and noting "This looks like a document of the documents that were held by DTC [Depository Trust Company], the physical documents that were held by DTC evidencing the Trust Certificate"), at p. 30:19-20 ("DTC holds the physical securities for Bear Stearns"), at p. 36:6-11 (noting securities sale to Bear Stearns typically involved a physical certificate being "delivered to the DTC cage for Bear Stearns' buyer").

[16]  Ex. 7 (Bond Power) at BSIL000112 (leaving "blank" transferee's identity); Ex. 6 (McCrink Dep.) at p. 52:19-21 (noting "Bear Stearns agreed to take these securities in, and agreed that we would take them in and get executed bond powers in blank").

[17]  Ex. 6 (McCrink Dep.) at pp. 34:3-36:14 (reviewing Bond Power) ("[Q] Do you know why that line is blank. [A] I do ... When
Footnote continued.

Thus, BSIL did not register the Trust Certificate in its name in the Certificate Register after purchasing it from AHMIC.[18]  Instead, AHMIC continued to be the Certificateholder listed in the Certificate Register.[19]  As the Certificateholder, and consistent with the terms of the Trust Documents, AHMIC

---

we executed this transaction with American Home, American Home and Bear Stearns reached an agreement to take this bond, negotiate it in blank ... So we took it what is known as blank ... [Q] If the security wasn't transferred in blank, then what would the difference be?  [A] A typical transaction would be this would be delivered on the trade date and the name of the buyer would be here.  And Bear Stearns would register the asset in the name of Bear Stearns as the buyer ... [Q] The purchaser would have been inserted in that blank. [A] Yes").

[18]  BSIL could not have registered the Trust Certificate in its name because the Trust Documents limit ownership to qualified REITs.  To become a Certificateholder, BSIL needed to execute a Certificate of REIT Status -- a factual impossibility because BSIL is not a REIT (and was not affiliated with one at that time).  Ex. 6 (McCrink Dep.) at p. 54:19-20 (noting "Bear Stearns didn't have a REIT at that time ...").

[19]  Ex. 6 (McCrink Dep.) at p. 53:6-9 ("[The Bear Entities] purchased the bond in May and we did not reregister it, it remained in the certificate registrar showing American Home as the holder"), at pp. 39:18-40:3 ("[Q] In this transaction prior to the transfer[,] who was the certificate holder with respect to the trust certificate prior to the transaction? [A] American Home. [Q] And after the transaction[,] who was the certificate holder with respect to this certificate? [A] The registered certificate holder after the purchase date was American Home"), at p. 52:22-24 ("And we agreed for the time that it was on repo to leave American Home as the certificateholder in the certificate registry").

continued to receive monthly principal and interest payments on account of the Trust Certificate through July 2007.[20]

AHMIC's entitlement to the principal and interest payments during the months immediately following its sale of the Trust Certificate under the BSIL Repo Agreement (through July 2007) is not disputed by the Bear Entities.  Indeed, BSIL would have received those distributions (and the August Payment) if the parties had negotiated a "cash flow redirection letter,"[21] pursuant to which AHMIC would have remitted the distributions to BSIL after receiving them.  AHMIC has executed cash flow redirection letters with other repurchase agreement counterparties that buy securities "in blank," including Morgan

----

[20]  See American Home's Responses And Objections To The First Set Of Contention Interrogatories Of The Bear Entities, dated March 31, 2008 at p. 6 ("American Home received payments for principal and interest accrued on the Trust Certificate through July 31, 2007"), a copy of which is annexed hereto as Exhibit 9; Deposition of American Home's Rule 30(b)(6) Witness, dated June 6, 2008 (the "**Sakamoto Dep.**") at p. 30:16-20 ("[Q] [A]fter the initial sale to BSIL on May 1st, American Home continued to receive principal and interest directly from Wells Fargo on the trust certificate; isn't that right? [A] Yes"), a copy of which is annexed hereto as Exhibit 10.

[21]  Ex. 6 (McCrink Dep.) at p. 84:9-14 ("[Q] What is your understanding of what a cash flow redirection letter is? [A] A cash flow redirection letter is something that might be used to instruct a servicer or trustee to send income payments, P&I, to other than the certificate holder").

Stanley & Co., Inc. ("**Morgan Stanley**").[22]  BSIL, however, never

requested that AHMIC execute a cash flow redirection letter.[23]

E.   **BSIL TERMINATES BSIL REPO AGREEMENT AND SELLS TRUST CERTIFICATE TO AFFILIATE SMOREIT; SMOREIT FAILS TO REGISTER TRUST CERTIFICATE PRIOR TO AUGUST RECORD DATE**

On August 3, 2007, BSIL terminated the BSIL Repo Agreement,

alleging AHMIC defaulted by purportedly failing to satisfy a

margin call.[24]  Thereafter, BSIL allegedly liquidated the

---

[22]  See, e.g., Master Repurchase Agreement, September 1996 Version, among AHMIC and Morgan Stanley, dated November 13, 2003 (the "**Morgan Stanley Repo Agreement**") (AHM-BS-0000693- AHM-BS-0000719), a copy of which is annexed hereto as Exhibit 11; "Distribution Instructions" letter dated April 13, 2007 to certificate registrar from AHMIC (the "**Morgan Stanley Cash Flow Redirection Letter**"), (AHM-BS-0000687 - AHM-BS-0000688), a copy of which is annexed hereto as Exhibit 12.

[23]  See Bear Entities Response to American Home's Second Set of Contention Interrogatories, dated April 22, 2008 ("**Bear's Response to Second Interrogatories**") at p.7 (admitting same), a copy of which is annexed hereto as Exhibit 13; Ex. 6 (McCrink Dep.) at pp. 84:15-85:2 ("[Q] In connection with the transfer of the trust certificate under the repurchase agreement, in connection with that transaction ... did the parties execute a cash flow redirection letter? [A] We did not. [Q] During the course of the negotiations with respect to that transaction was a cash flow redirection letter ever discussed? [A] It was not").

[24]  The parties have agreed expressly that the propriety of BSIL's margin call, any events relating thereto (including, but not limited to BSIL's defaulting AHMIC, termination of the BSIL Repo Agreement, and the subsequent sale of the securities pledged thereunder), would not be litigated in this adversary proceeding and expressly reserve any and all rights, claims, and defenses relating thereto.  See Stipulation And Consent Order Setting Discovery Schedule And Reserving Rights Regarding Bear Stearns' Cross-Claims And American Home's Counterclaim, dated January 14, 2008 (as

Footnote continued.

securities through various auctions,[25] selling the Trust

Certificate to a newly-formed REIT, Defendant Strategic Mortgage

Opportunities REIT, Inc. ("**SMOREIT**").[26]  SMOREIT appears to have

been formed at or around the time of the auction and American

Home's bankruptcy filing.[27]  After purchasing the Trust

Certificate, however, SMOREIT failed to promptly register the

certificate in its name in the Certificate Register.  The Bear

Entities describe that failure as a "clerical error."[28]

---

amended, the "**Scheduling Stipulation**"), a copy of which is annexed hereto as Exhibit 14.

[25] Letter from Bear Entities to American Home, dated September 7, 2007 (AHM-BS-0000473-481), a copy of which is annexed hereto as Exhibit 15.

[26] See also BSIL000046 (SMOREIT account statement confirming transaction), a copy of which is annexed hereto as Exhibit 16.  Ex. 6 (McCrink Dep.) at p. 64:16-19 ("The winner of the bid happened to be SMOREIT, and so the assets were sold from Bear Stearns International Limited to SMOREIT").

[27] See Ex. 6 (McCrink Dep.) at p. 86:2-11 ("[Q] Was there any discussion that [Defendant] SMOREIT would be the purchaser of the trust certificate at the time that the transaction was negotiated? [A] No, SMOREIT wasn't in existence then. [Q] When did SMOREIT come into existence? [A] Probably around the September timeframe or August timeframe").

[28] See Answer Of Defendants Bear Stearns Mortgage Capital Corp., Bear Stearns & Co., Inc., Bear Stearns International Limited, And Strategic Mortgage Opportunities REIT, Inc., dated December 11, 2007 (the "**Bear Answer**") at p. 4-5 (¶ 14) ("[B]ecause of a clerical error, SMOREIT did not reregister the Trust Certificate in its name prior to the Record Date..."), a copy of which is annexed hereto as Exhibit 17.  Ex. 6 (McCrink Dep.) at pp. 65:14-66:4 ("When SMOREIT purchased the asset, winning the auction, what should have happened was the operational guys that support Bear Stearns
Footnote continued.

The Record Date for principal and interest distributions payable on the Trust Certificate for the month of August 2007 (the **"August Payment"**) was August 31, 2007 (hereinafter, the **"August Record Date"**), and the Payment Date for the August Payment was September 25, 2007.  SMOREIT did not register in the Certificate Register before those dates.  In fact, the Trust Certificate was not registered in SMOREIT's name until on or about September 28, 2007 -- approximately seven weeks after it purchased the certificate from BSIL.[29]  Neither the Bear Entities nor Wells Fargo disputes that "the Trust Certificate was

---

should have taken that certificate ... and they should have taken that certificate and taken the bond power and written SMOREIT on it and handed it -- sent it to Wells Fargo to be reregistered.  That is what should have happened on that settlement date, but we had an administrative clerical error where our settlements team did not follow through on that trade date and send the bond off for re-registration"), at p. 67:15-18 ("This just slipped from their radar screen and they forgot to reregister it on that purchase date...").

[29]  See Bear Entities' Email dated September 28, 2007 (BSIL000069) ("I have just received verbal confirmation that all of the American Home ... certs have been re-registered in Bear's name"), a copy of which is annexed hereto as <u>Exhibit 18</u>; September 28, 2007 Letter from Wells Fargo to the Bear Entities (AHM-BS-0000443- AHM-BS-0000444) ("For the American Home Mortgage Investment Trust 2006-3 transfer, the entire process is also complete and [SMOREIT] is listed as the holder of record"), a copy of which is annexed hereto as <u>Exhibit 19</u>.

registered in AHM's name in the Certificate Register as of August

31, 2007 [i.e., the August Record Date]."[30]

F.    **BEAR ENTITIES DEMAND AUGUST PAYMENT**

The Bear Entities since have repeatedly demanded the

Certificate Registrar (Plaintiff Wells Fargo Bank, N.A. ("**Wells**

**Fargo**")) to distribute the August Payment to them,[31] even

threatening litigation for failure to comply with that

instruction.[32]  Wells Fargo responded by identifying the

Certificate Registrar's obligation to make monthly payments to

the *Certificateholder*:  "if certificates are transferred using

---

[30]  Objections And Responses To American Home's First Set of
Contention Interrogatories By The Bear Entities, dated April
11, 2008 ("**Bear's Response to First Interrogatories**") at p.5
(admitting same), a copy of which is annexed hereto as
Exhibit 20. See Certificate Register dated August 31, 2007
(WEL-AHM0000769), a copy of which is annexed hereto as
Exhibit 21 (listing American Home as the Certificateholder of
the Trust Certificate).

[31]  See September 24, 2007 Letter from the Bear Entities to Wells
Fargo (WEL-AHM0000761 – WEL-AHM0000762), a copy of which is
annexed hereto as Exhibit 22 ("By this Letter, we direct you
to make the P&I payments ... to Bear Stearns"); September 28,
2007 Letter from the Bear Entities to Wells Fargo
(BSIL000053) ("Bear Stearns is entitled to each of the P&I
Payments ..."), annexed hereto as Exhibit 23.

[32]  See Ex. 22 (September 24, 2007 Letter from Bear to Wells
Fargo) ("...if you: (i) fail to make the P&I Payments as
directed in this letter, and/or (ii) make the P&I Payments to
AHM ... we will hold you strictly liable and will immediately
exercise all available legal rights and remedies against
you").

17

*proper procedures* by the *record date*, the new holder will be

entitled to payment ..." (emphasis in original).[33]

Ultimately, to resolve competing claims to the August

Payment, Wells Fargo commenced the instant interpleader action on

November 27, 2007 against the American Home Defendants, Bear

Stearns Mortgage Capital Corp. (**"BSMCC"**), Bear, Stearns & Co.

Inc. (**"BSC"**), BSIL, and SMOREIT (together, BSMCC, BSC, BSIL and

SMOREIT shall be referred to collectively as the **"Bear**

**Entities"**).  The parties have completed discovery, including

document production, interrogatories, and depositions, and now

submit cross-motions for summary judgment.[34]

### III. ARGUMENT

**A.    SUMMARY JUDGMENT STANDARD**

Rule 56 of the Federal Rules of Civil Procedure, made

applicable to adversary proceedings pursuant to Rule 7056 of the

Federal Rules of Bankruptcy Procedure, require that a court enter

summary judgment "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is

---

[33]  See September 21, 2007 Email from Wells Fargo, to the Bear
Entities (BSIL000075-76), a copy of which is annexed hereto
as Exhibit 24.

[34]  See Ex. 14 (Scheduling Stipulation).

entitled to judgment as a matter of law."[35]  The purpose of the rule "is to isolate and dispose of factually unsupported claims or defenses."[36]

Once the moving party has shown an absence of material fact, then the non-moving party may only survive a motion for summary judgment if it presents "specific facts showing that there is a genuine issue for trial."[37]  The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts" -- the issue of fact must be "genuine."[38]  An issue is "genuine" if "a reasonable jury could possibly find in favor of the non-moving party with regard to that issue."[39]

## B.    MATERIAL FACTS ARE NOT IN DISPUTE

The pleadings, interrogatory responses, documents produced, and deposition testimony establish that the following material facts are not in dispute:

• When AHMIC sold the Trust Certificate to BSIL under the BSIL Repo Agreement, the Trust Certificate was transferred to

---

[35]  Federal Rule of Civil Procedure 56(c).

[36]  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

[37]  Indemnity Ins. Co. of North America v. Integrated Health Svcs., Inc. (In re Integrated Health Services, Inc.), 375 B.R. 730, 735 (D. Del. 2007), citing Matsushita Elec. Indus. Co. V. Zenith Radio, 475 U.S. 574, 585-86 (1986).

[38]  Matsushita at 586.

[39]  Indemnity Ins. Co., 375 B.R. at 735.

BSIL "in blank" form.  AHMIC remained the registered Certificateholder in the Certificate Register.[40]

- Under the Trust Documents, AHMIC, as the registered Certificateholder, was entitled to the principal and interest distributions.[41]

- The Trust Documents provided that BSIL, which was not a REIT, could not have been the Certificateholder.[42]

- Between May 2007 and July 2007, after AHMIC sold the Trust Certificate to BSIL under the BSIL Repo Agreement, AHMIC was entitled to receive, and did receive principal and interest distributions.[43]

- American Home was the Certificateholder of the Trust Certificate listed in the Certificate Register on the August Record Date (i.e., August 31, 2007).[44]

- The Trust Documents require Wells Fargo to make the August Payment to the Certificateholder listed in the Certificate Register on the August Record Date.[45]

- Even though BSIL terminated the BSIL Repo Agreement on August 3, 2007 and sold the Trust Certificate on August 10, 2007 to a newly-formed REIT affiliate (SMOREIT), SMOREIT did not register itself as the owner of the Trust Certificate in

---

[40] Ex. 5 (Trust Certificate) at BSIL000101, BSIL000105; Ex. 7 (Bond Power) at BSIL000112; Ex. 6 (McCrink Dep.) at pp. 39:18-40:3, at p. 52:19-21, at p. 85:19-25.

[41] Ex. 3 (Trust Agreement) at p. 19 (§ 5.02) (AHM-BS-0000024); p.6 (§ 3.03) (AHM-BS-0000013); Ex. 5 (Trust Certificate) at BSIL000103; at BSIL000108.

[42] Ex. 5 (Trust Certificate) at BSIL000101, BSIL000105.

[43] Ex. 9 (American Home's Response to First Interrogatories) at p. 6.

[44] Ex. 6 (McCrink Dep.) at pp. 39:18-40:3; Ex. 20 (Bear Response to First Interrogatories) at p.5.

[45] Ex. 3 (Trust Agreement) at p. 19 (§ 5.02) (AHM-BS-0000024), at p.6 (§ 3.03) (AHM-BS-0000013); Ex. 5 (Trust Certificate) at BSIL000103, at BSIL000108.

the Certificate Register until September 28, 2007, nearly thirty days after the August Record Date.[46]

**C.    DOCUMENTS UNAMBIGUOUSLY DIRECT WELLS FARGO TO MAKE AUGUST PAYMENT TO CERTIFICATEHOLDER ON AUGUST RECORD DATE -- AHMIC**

The Trust Documents specifically direct the Certificate Registrar to make distributions to the Certificateholder of record on the preceding Record Date.  They also define Certificateholder as the person in whose name a Certificate is registered in the Certificate Register.  While the agreements allow for certificate transfers, they specifically instruct transferees on how to receive principal and interest distributions.  This requires registration in the Certificate Register maintained by the Certificate Registrar, without which the transferee cannot attain Certificateholder status and cannot receive distributions.[47]

---

[46]  Wells Fargo's Amended Complaint In The Nature Of Interpleader, dated November 19, 2007, at p. 3 (¶ 13), at p. 5 (¶ 18), a copy of which is annexed hereto as Exhibit 25; Ex. 2 (American Home Answer) at p. 5 (¶ 14); Ex. 17 (Bear Answer) at pp. 4-5 (¶ 14), at p. 6 (¶ 19); Ex. 18 (September 28, 2007 Bear Entities' E-mail) (BSIL000069); Ex. 19 (September 28, 2007 Letter from Wells Fargo to the Bear Entities) (AHM-BS-0000443).

[47]  Ex. 3 (Trust Agreement) at p. 2 (§ 1.01) (AHM-BS-0000007), at p. 8 (§ 3.03) (AHM-BS-0000013), at p. 19 (§ 5.02) (AHM-BS-0000024); Ex. 5 (Trust Certificate) at BSIL000103 and BSIL000108; Ex. 4 (Indenture) at Appendix A p. 6 (AHM-BS-0000337).

The agreements also contemplate the very facts presented here -- where a transferee (SMOREIT) fails to register the certificate before the applicable Record Date (August 31, 2007) -- and specifically authorize the Certificate Registrar (Wells Fargo) to deem the transferor (AHMIC) the owner for all purposes and the Certificateholder entitled to distributions until the transferee (SMOREIT) registers the certificate.  The documents further authorize Wells Fargo to ignore notices to the contrary, including the Bear Entities' barrage of correspondence demanding the August Payment.[48]

The Trust Documents do not support the Bear Entities' argument that they are entitled to the August Payment.  Instead, rights granted under the Trust Agreement are limited to a defined class of beneficiaries (including Certificateholders) which does not include entities that have not registered their ownership interests in the Certificate Register.[49]

---

[48]  Ex. 3 (Trust Agreement) at pp. 12-13 (§ 3.07) (AHM-BS-0000017 - 18).

[49]  Ex. 3 (Trust Agreement) at p. 36 (§ 10.03) (AHM-BS-0000041) ("[T]he provisions of this Trust Agreement are solely for the benefit of the Owner Trustee, the Master Servicer, the Certificateholder and, to the extent expressly provided herein, the Noteholders, and nothing in this Trust Agreement ... whether express or implied, shall be construed to give to any other Person any legal or equitable right, remedy or claim in the Owner Trust Estate or under or in respect of this Trust Agreement or any covenants, conditions or provisions contained herein").

Moreover, under the BSIL Repo Agreement, AHMIC did not sell
BSIL any additional ownership interests in the Trust Certificate
beyond the certificate itself, retaining the right to receive
income, i.e., principal and interest distributions, as the
Certificateholder.  See Ex. 10 (Sakamoto Dep.) at p. 17:14-17:17
(noting AHMIC "sold [BSIL] the blank certificate and the bond
powers.  And whatever rights [BSIL has] for those two instruments
is what we sold [BSIL]").

The terms of the Trust Documents reflect that arrangement --
income entitlement stays with AHMIC as the registered
Certificateholder.  As BSIL admits, the BSIL Repo Agreement does
not provide to the contrary.[50]  In fact, it seems to contemplate

---

[50]  See Ex. 6 (McCrink Dep.) at pp. 55:19-56:21 ("[Q] [Reviewing
      Bear Stearns' Interrogatory Responses] Now, what is that
      agreement that you are referring to in that sentence?  [A]
      The agreement I am referring to is that since we recognized
      that allowed American Home to remain the registered holder on
      the certificate registrar, that is what the agreement is,
      American Home was the registered owner under the certificate,
      and we are talking about the repo agreement and when a bond
      is purchased on repo ... there are reference to a repo
      agreement that talk about *when something is on repo, that the
      seller is entitled to receive the income on the bond ...
      [S]ince we -- it was not reregistered ... it remained in the
      certificate register held by American Home, so [principal and
      interest] would have gone directly to them*") (emphasis
      added).

that for registered securities, the registered owner on the record date will receive the income payments.[51]

At bottom, (a) the parties agreed the Trust Certificate would not be registered to BSIL after it was sold under the BSIL Repo Agreement and instead would be transferred "in blank;" (b) AHMIC sold BSIL only the Trust Certificate and not rights to its income distributions; (c) after AHMIC sold the Trust Certificate to BSIL, it remained the Certificateholder entitled to receive income; and (d) after BSIL terminated the BSIL Repo Agreement and sold the Trust Certificate to SMOREIT, SMOREIT failed -- prior to the August 31, 2007 Record Date -- to register the Trust Certificate in its name.  Accordingly, Wells Fargo must make the August Payment to AHMIC as the Certificateholder appearing in the Certificate Register on the August Record Date.

D.    **BEAR ENTITIES FAILED TO SECURE PROTECTIONS THAT SIMILARLY SITUATED REPO-COUNTERPARTIES OBTAIN**

When a trust certificate is transferred "in blank" form, the unregistered transferee (or repo-buyer) can receive the monthly principal and interest distributions by demanding (through a cash

---

[51]   Ex. 1 (BSIL Repo Agreement) at p. 4 (¶2(x)) (WEL-AHM0000657) (defining *Income Payment Date* as "... in the case of registered securities, the date by reference to which *particular registered holders are identified as being entitled to payment of income*") (emphasis added).

flow redirection letter) that the transferor (repo-seller)
instruct the certificate registrar to make income payments
directly to the unregistered transferee.  AHMIC's transactions
with Morgan Stanley provide such an example, where AHMIC sold to
Morgan Stanley under the Morgan Stanley Repo Agreement the trust
certificate issued to AHMIC from the AHMIC Investment Trust 2005-
2 (the "**2005-2 Trust Certificate**").  AHMIC also transferred that
security "in blank," and Morgan Stanley neither became the
certificateholder nor acquired the right to receive income
distributions.  But Morgan Stanley insisted that AHMIC instruct
the certificate registrar to make monthly principal and interest
distributions directly to Morgan Stanley pursuant to the Morgan
Stanley Cash Flow Redirection Letter.[52]

Unlike Morgan Stanley, BSIL never requested a cash flow
redirection letter when negotiating the purchase of the Trust
Certificate from AHMIC.[53]  If it had, SMOREIT would have been
entitled to the August Payment irrespective of whether it
registered the Trust Certificate before the August Record Date.

---

[52]  See Ex. 12 (Morgan Stanley Cash Flow Redirection Letter)(AHM-
BS-0000687) ("[A]ll payments or distributions of any kind of
the Certificate are required to be made to Buyer by wire
transfer").

[53]  Ex. 13 (Bear's Response to Second Interrogatories) at p.7;
Ex. 6 (McCrink Dep.) at pp. 84:15-85:2.

E.   **POLICY CONSIDERATIONS MILITATE STRONGLY IN FAVOR OF STRICTLY PRESERVING SANCTITY OF RECORD DATE PROVISIONS**

Directing that the August Payment be paid to the registered Certificateholder on the August Record Date (AHMIC) irrespective of BSIL's competing claims comports squarely with the intended purpose of record-date provisions in indentures and trust agreements.  These provisions inject certainty into the distribution process and thereby protect and aid the trustee in distributing trust income and assets.  See, e.g., Ruei-Chan v. Pierce, 2004 WL 2072460 at *15 (S.D.N.Y. 2004) ("The 'record date' is the date fixed by the trustee, registrar, paying agent or issuer *for the purpose of determining the holders of ... unit investment trust securities entitled to receive dividends, interest or principal payments or any other distributions*") (emphasis added); U.S. Trust Co. of New York v. Alpert, 10 F. Supp. 2d 290, 299 (S.D.N.Y. 1998) (examining entitlement to funds paid into trusts formed for settlement of securities fraud claims; holders of trust interests on "Record Date" were entitled to funds, not former holders of such interests (even though former holders argued they were real victims of securities fraud)).[54]

---

[54] See also Jamie Sec. Co. v. The Limited, Inc., 880 F.2d 1572, 1573 (2d Cir. 1989)("As is common in large, widely-distributed securities issues, a record date was established to simplify the duties of the Trustee obligated to make the
Footnote continued.

The Bear Entities may argue "equitable considerations" demand flexibility.  That result, however, undermines the purposes of record dates and their ability to protect trustees, to inject certainty, and to facilitate administration.[55]

---

interest payments"); United States Trust Co. of New York v. Executive Life Ins. Co., 602 F. Supp. 930, 937 (S.D.N.Y. 1984) ("The record date mechanism allows the trustee to perform the ministerial function of paying interest to the bondholders in an orderly and uniform manner;" noting "record dates ... became necessary when notes began to be sold in large volume"); In re Bashford's Estate, 178 Misc. 951, 36 N.Y.S. 2d 651, 656 (1942) ("*[T]he rights of respective beneficiaries of a trust ... should be determined by their status on the record date*") (emphasis added).

[55] A few days before BSIL terminated the BSIL Repo Agreement (on August 3, 2007), the Bear Entities' concerns over American Home's financial performance (and their ability to terminate commitments to American Home and liquidate securities) prompted a review of the registration status of various securities sold by American Home (including the Trust Certificate).  See Ex. 6 (McCrink Dep.) at pp. 103:18-104:6 (reviewing email dated July 30, 2007 addressed to the Bear Entities (a copy of which is annexed hereto as Exhibit 26) and explaining they were told that Trust Certificate was "registered in the client's name ... and that is American Home"); Ex. 6 (McCrink Dep.) at p. 74:4-13 ("[I]n this time frame of late July we were growing concerned with the economic condition of American Home, and so what we wanted to do is ... make sure that ... in the event of default of American Home ... that we had all of the correct certificates so that they would be in ... good negotiable form"), at p. 104:13-16 ("[E]verybody recalled on day one that the bonds were taken in blank, there was a reminder here in July that it was taken in blank") (emphasis added).

IV.   **CONCLUSION**

For the foregoing reasons, the American Home Defendants respectfully request that the Court enter an Order granting the Motion, ruling in favor of the American Home Defendants and against the Bear Entities with respect to the Interpleader Complaint, directing Wells Fargo to distribute the August Payment to AHMIC, and granting such further, different relief as the Court considers appropriate.

Respectfully submitted,

Dated:   Wilmington, Delaware        **YOUNG, CONAWAY,**
         July 2, 2008                **STARGATT & TAYLOR, LLP**

Patrick A. Jackson (No. 4976)
John T. Dorsey (No. 2988)
Erin D. Edwards (No. 4392)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
Telephone:  (302) 571-6600

-and-

**QUINN, EMANUEL, URQUHART,**
**OLIVER & HEDGES, LLP**
Susheel Kirpalani
James C. Tecce
Harrison L. Denman
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7199

*Counsel to American Home*
*Mortgage Investment Corp. and*
*American Home Mortgage*
*Acceptance, Inc.*

28