October 30, 2008

Duane Morris LLP
Frederick B. Rosner
1100 North Market Street, Suite 1200
Wilmington, Delaware  19801


        - and –

Sidley Austin LLP
Andrew W. Stern
Jason R. Goldy
Owen H. Smith
787 Seventh Avenue
New York, New York 10019


Attorneys for Defendants Bear
Stearns Mortgage Capital Corp.,
Bear, Stearns & Co. Inc., Bear,
Stearns International Limited
and Strategic Mortgage
Opportunities REIT Inc.

Young Conaway Stargatt &
Taylor, LLP
John T. Dorsey
Erin D. Edwards
Patrick Jackson
1000 West Street, 17th Floor
Wilmington, Delaware  19801


        - and -

Quinn Emanuel Urquhart Oliver
& Hedges, LLP
Susheel Kirpalani
James C. Tecce
Harrison L. Denman
51 Madison Avenue, 22nd Floor
New York, New York 10010


Counsel to American Home
Mortgage Investment Corp. and
American Home Mortgage
Acceptance, Inc.

> **RE:    Wells Fargo Bank, N.A. v. American Home Mortgage Investment
> Corp, et al., Adv. Pro. No. 07-51741**

Dear Counsel:

Before the Court are cross motions for summary judgment seeking a

determination as to which entity is entitled to a monthly payment of principal

and interest in the amount of $1.8 million under a securitized pool of home

mortgages.

The debtors originally obtained an ownership interest in a securitized pool of mortgages, which was evidenced by a Trust Certificate registered in the debtors' name.  The Trust Certificate, in turn, was sold to a Bear Stearns entity under a repurchase agreement.  Under the repurchase agreement, Bear Stearns was the owner of the Trust Certificate.  Nonetheless, the debtors remained the registered holder of the Trust Certificate and continued to receive the monthly principal and interest payments until the repurchase agreement was cancelled in early August, 2007.  Notwithstanding the cancellation of the repurchase agreement, Bear Stearns did not register as the owner of the Trust Certificate until shortly after the record date and payment date for August.  Since September, 2007, Bear Stearns has received the monthly payments under the Trust Certificate.

The issue before the Court is whether Bear Stearns, as owner of the Trust Certificate under the repurchase agreement, or the debtors, as the registered holder of the Trust Certificate, are entitled to the payment.  The Court finds that, based upon the plain meaning of the controlling contracts, the monthly principal and interest payments are to be made to the registered holder, i.e., the debtors.  Thus, the Court will grant the debtors' motion for summary judgment and deny Bear Stearns's cross motion for summary judgment.

## JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. § 1334. Venue of this proceeding is proper in this district under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. §§ 157(b)(2).

## STATEMENT OF FACTS[1]

Prior to filing of bankruptcy, American Home Mortgage Holdings, Inc. and its affiliated debtors (collectively, the "Debtors") were in the business of originating, selling and servicing home mortgage loans.[2] In addition, the Debtors invested directly in mortgage–backed securities. American Home Investment Corp. ("American Home Investment") is a real estate investment trust ("REIT") that invested in mortgage-backed securities issued by its affiliates. American Home Investment financed the purchase of these securities through repurchase agreements, pursuant to which American Home Investment sold the securities and agreed to repurchase them at a later date.[3] One such repurchase agreement was the Global Master Repurchase Agreement among Bear Stearns International Limited ("Bear Stearns International") and American Home Investment, dated October 28, 2004 (the "Repo Agreement").

On December 28, 2006, the Debtors securitized certain mortgages by depositing them into the American Home Mortgage Investment Trust 2006-3 (the

---

[1] Unless otherwise noted, the controlling facts in this case are undisputed.

[2] Not all of the Chapter 11 debtors are defendants in this adversary proceeding. The term "Debtors" refers only to those Chapter 11 debtors that are parties to this adversary proceeding.

[3] *See, generally, Calyon New York Branch v. American Home Mortgage Corp. (In re American Home Mortgage Holdings, Inc.)*, 383 B.R. 585 (Bankr. D. Del. 2008).

"Trust"). The Trust issued a series of Trust Certificates (Series 2006-3) under the Amended and Restated Trust Agreement, dated as of December 28, 2006 (the "Trust Agreement", collectively with the Trust Certificate, the "Trust Documents"). The Trust Certificate that is the subject of this proceeding was issued by the Trust under the Trust Agreement. It represents a 100% fractional, undivided interest in the Trust.

On December 28, 2006, the same date the Trust was formed and it issued the Trust Certificate, American Home Investment registered its interest in the Trust with the "Certificate Registrar" in the "Certificate Register."[4] Thereafter, American Home Investment received monthly principal and interest payments under the Trust Certificate from January 2007 through July 2007.

The Trust Agreement provides that monthly principal and interest distributions are to be made to the current "Certificateholder" of record on the "Record Date."[5] Under the Trust Agreement, the "Certificateholder" is defined to mean the registered owner of the Trust Certificate, specifically "the Person in whose name the [Trust] Certificate is registered in the Certificate Register."

The Trust Certificate contains similar instructions with respect to

---

[4] The definitions of these terms under the Trust Documents are obvious.

[5] Trust Agreement at p. 19 (§ 5.02) ("Distributions required to be made to the Certificateholder on any Payment Date . . . shall be made to the Certificateholder of record on the preceding Record Date").

distributing principal and interest payments:

> There will be distributed on the 25th day of each month . . . (each, a 'Payment Date'), commencing on December  26, 2006, to the Person in whose name this [Trust] Certificate is registered at the close of business on the last Business Day of the month immediately preceding such Payment Date (the 'Record Date'), such Certificateholder's Percentage Interest in the amount to be distributed to Certificateholders on such Payment Date.[6]

The Trust Certificate directs the Certificate Registrar to look to the Certificate Register to determine the appropriate recipients of principal and interest distributions and authorizes it to disregard notices of alleged ownership interests that are not corroborated by the Certificate Register. [7]

   While the Trust Certificate is transferable, the transferee becomes the Certificateholder when it registers its interest with the Certificate Registrar.[8]  The Trust Agreement contemplates that, before a transferee registers its ownership interest, the Certificate Registrar may make distributions to the existing Certificateholder, i.e., the entity then-listed in the Certificate Register, instead of the transferee.[9]  The Trust Certificate provides that (a) it can only be held by a

---

[6] Trust Certificate at BSIL000103.

[7] Trust Certificate at BSIL000108. ("[T]he Certificate Registrar . . . may treat the person in whose name this [Trust] Certificate is registered as the owner hereof for all purposes, and none of the Owner, Trustee, the Certificate Paying Agent, the Certificate Registrar or any such agent shall be affected by any notice to the contrary.").

[8] Trust Agreement at p. 9 (§3.03) ("A transferee of a [Trust] Certificate shall become a Certificateholder and shall be entitled to the rights and subject to the obligations of a Certificateholder hereunder upon such transferee's name pursuant to and upon satisfaction of the conditions set forth in Section 3.05 [Registration of and Limitations on Transfer and Exchange of Certificate.'"]).

[9] Trust Agreement at p. 12 (§3.07) ("Prior to due presentation of [Trust] Certificate for registration of transfer . . . the Certificate Registrar . . . may treat the person in whose name the [Trust] Certificate is registered in the Certificate Register as the owner of such [Trust] Certificate for the

REIT and (b) unless the holder (as a transferee or otherwise) is a REIT, it cannot

qualify as a Certificateholder.[10]

On May 1, 2007, American Home Investment sold the Trust Certificate to

Bearn Stearns International under the Repo Agreement.  Section 6(f) of the Repo

Agreement provides:

> Notwithstanding the use of expressions such as "Repurchase Date," "Repurchase Price," "margin," "Net Margin," "Margin Ratio" and "substitution," which are used to reflect terminology used in the market for transactions of the kind provided for in this Agreement, all right title, and interest in and to Securities and money transferred or paid under this [Repo] Agreement shall pass to the transferee upon transfer or payment, the obligation of the party receiving Purchased Securities or Margin Securities being an obligation to transfer Equivalent Securities or Equivalent Margin Securities.[11]

In addition, section 5(i) of the Repo Agreement provides:

> (i) where the Term of a particular Transaction extends over an Income Payment Date in respect of any Securities subject to that Transaction, [Bear Stearns International] shall on the date such Income is paid by the issuer transfer or credit to the account of [American Home Investment] an amount equal to (and in the same currency as) the amount paid by the issuer.[12]

The Repo Agreement is otherwise silent concerning whether the registered

Certificateholder or the owner of the Trust Certificate is entitled to the monthly

principal and interest payments under the Trust Certificate.

---

purpose of receiving distributions . . .  [and] the Certificate Registrar . . . shall [not] be bound by any notice to the contrary.").

[10] Trust Certificate at BSIL000101 and BSIL000105.

[11] Repo Agreement at p. 13 (§6(f)).

[12] *Id*. at p. 11 (§5(i)).

There is evidence, however, that because Bear Stearns did not have an affiliate that was a REIT eligible to be a Certificateholder it requested American Home Investment to transfer the Trust Certificate "in blank."[13]  This meant that the Trust Certificate would not be registered in Bear Stearns International's name as the buyer or transferee at the time of the transfer (even though American Home Investment was selling the Trust Certificate to Bear Stearns International under the Repo Agreement).  Instead, the provisions in the transfer documents that identify the transferee to whom the Trust Certificate was being transferred were "left blank."

In any event, Bear Stearns International did not register the Trust Certificate under its name in the Certificate Register after purchasing it from American Home Investment.  Instead, American Home Investment continued to be the Certificateholder listed in the Certificate Register and to receive monthly principal and interest payments on account of the Trust Certificate through July 2007.  American Home Investment's entitlement to the principal and interest payments during the months following its sale of the Trust Certificate under the Repo Agreement (through July 2007) is not disputed.

On August 3, 2007, Bear Stearns International terminated the Repo Agreement, alleging that American Home Investment had defaulted by failing to

---

[13] Although the Debtors acknowledge that the documents were issued "in blank," they dispute both that it was done for the purpose asserted by Bear Stearns and that it was done at Bear Stearns's request.

satisfy a margin call.[14]   Thereafter, Bearn Stearns International liquidated the
securities by selling the Trust Certificate at auction to a newly–formed REIT,
Strategic Mortgage Opportunities REIT, Inc. ("Strategic Mortgage").   After
purchasing the Trust Certificate, however, Strategic Mortgage did not promptly
register the Trust Certificate under its name in the Certificate Register.

The principal and interest distribution for the month of August, 2007, was
approximately $1.8 million (the "August Payment").   The Record Date was
August 31, 2007, and the Payment Date was September 25, 2007.   Strategic
Mortgage registered the Trust Certificate in its name on September 28, 2007 –
approximately seven weeks after it purchased the Trust Certificate and after both
the Record Date and the concomitant Payment Date for August.

Both American Home Investment and Strategic Mortgage demanded that
the Certificate Registrar distribute the August Payment to them.   Ultimately, to
resolve the competing claims, the Certificate Registrar commenced this
interpleader action against the Debtors and certain Bear Stearns entities ("Bear
Stearns").[15]   The Debtors and Bear Stearns filed cross-motions for summary
judgment and oral argument was held in October, 2008.   This matter is now ripe
for decision.

---

[14] The Debtors dispute the propriety of Bear Stearns International's termination of the Repo
Agreement but that issue is neither before the Court nor relevant for present purposes.

[15] Specifically, Bear Stearns International, Strategic Mortgage and Bear Stearns Mortgage Capital
Corp.

## DISCUSSION

### I.  The Legal Standard

### A.    Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure, as made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, states that a court should grant a summary judgment motion "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[16]   The burden of proving these two elements rests on the party moving for summary judgment.[17]   The fact that the parties have filed cross-motions for summary judgment does not alter the Court's Rule 7056 analysis.

> The mere fact that both parties have filed motions for summary judgment does not constitute proper grounds for a decision that no genuine issues of material fact exist, but "the court must rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard."[18]

---

[16] Fed. R. Civ. P. 56(c). *See, e.g., Norfolk Southern Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91 (3d Cir. 2008); *Alcoa, Inc. v. U.S.*, 509 F.3d 173, 175 (3d Cir. 2007); and *Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne,* 497 F.3d 337, 347 (3d Cir. 2007).

[17] *El v. Southeastern Pennsylvania Transp. Auth. (SEPTA)*, 479 F.3d 232, 237 (3d Cir. 2007) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)).

[18] *Besso v. Cummins Intermountain, Inc.*, 885 F.Supp. 1516, 1520 (D. Wyo. 1995) (*quoting* 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure, § 2720, at 23 (1983)).

The material facts of this case are not in dispute.  Thus, only an issue of law remains.[19]

**B.    Contract Interpretation**

The contracts at issue, i.e., the Trust Documents on the one hand and the Repo Agreement on the other, are governed under different laws.  Specifically, the Trust Documents are governed by Delaware law[20] while the Repo Agreement is governed by the law of England. [21]  Under both sets of law, however, the Court is required to interpret the contract by determining its plain meaning.  Nonetheless, under English law, the Court must also consider the facts and circumstances surrounding the contract.

**i.  Delaware Law**

The Delaware law governing interpretation of a contract was set forth succinctly in *Rhone-Poulenc Basic Chem. Corp. v. American Motorists Ins. Co.*

> The proper construction of any contract . . . is purely a question of law.
>
> * * *
>
> Clear and unambiguous language in [a contract] should be given its ordinary and usual meaning.  Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it.
>
> * * *

---

[19] *SUPERVALU, Inc. v. Board of Trustees of Sw. Pa. and W. Md. Area Teamsters and Employers Pension Fund*, 500 F.3d 334, 340 (3d Cir. 2007) ("The parties stipulated to the facts before the Arbitrator and District Court, so only a question of law remains.").

[20] Trust Agreement at p. 37 (§10.11) and Trust Certificate at BSIL000106, respectively.

[21] Repo Agreement at p. 26 (§17).

A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.  Ambiguity does not exist where the court can determine the meaning of a contract "without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends."  Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty.  The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. [22]

### ii.  English Law

In the case of *Investors Compensation Scheme v. West Bromwich Building Society* [1998] 1 WLR 896, Lord Hoffmann identified the following five key principles concerning the interpretation of contracts:

(1) Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

(2) The background was famously referred to by Lord Wilberforce as the 'matrix of fact', but this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.

(3) The law excludes from the admissible background the previous negotiations of the parties and their declarations of

---

[22] *Rhone-Poulenc Basic Chem. Corp. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195-96 (Del. 1992) (internal citations omitted).

subjective intent. They are admissible only in an action for rectification...

(4) The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean...

(5) The 'rule' that words should be given their 'natural and ordinary meaning' reflects the commonsense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had....

Subsequent cases have noted that "[o]ne of the unhappy consequences of these passages is that parties to commercial disputes, in which the interpretation of the contract is in issue, can be tempted to put in a large amount of evidence and documentation by way of 'background' . . . This is despite the fact that, in *BCC v Ali* [2001] 1 AC 251, Lord Hoffmann qualified his phrase 'absolutely anything' by saying that this could only mean 'anything which a reasonable man would have considered relevant' and he made plain that his speech in *Investors Compensation Scheme* was not designed to "encourage a trawl through 'background' which could not have made a reasonable person think that the parties must have departed from conventional usage."[23]

---

[23] *Persimmon Homes v. Hall Aggregates* [2008] EWHC 2379 (TCC), [2008] All ER (D) 114 (Oct), (Approved Judgment) [This case comes from the Queen's Bench Division, Technology and Construction Court].

As a result, under English law, "it is always necessary for the court to consider the factual background to a commercial contract even if the wording of that contract might be regarded as unambiguous or sensible."[24]  Nevertheless, "it is necessary to retain a proper balance between the factual background on the one hand and the actual words used in the contract, on the other."[25]

## II.   Under the Plain Meaning of the Trust Documents, American Home Investment is Entitled to the August Payment

The Debtors argue that, under the clear and unambiguous terms of the Trust Documents, American Home Investment is entitled to the August Payment.  The Trust Agreement and Trust Certificate both provide that the monthly principal and interest payments are to be made to the holder of the Trust Certificate on the Record Date *as reflected in the "Certificate Register."*

Indeed, the Trust Documents *require* that the monthly payments be made to the registered holder of the Trust Certificate.  Specifically, the Trust Agreement provides that the "[d]istributions required to be made to the Certificateholder on any Payment Date . . . *shall be made to the Certificateholder of record* on the preceding Record Date."[26]  The Trust Certificate further provides that "*[t]here will be distributed [on the Payment Date] to the Person in whose name this [Trust] Certificate is registered [on the Record Date]* such Certificateholder's Percentage

---

[24] *Id.  See also Westminster CC v. National Asylum Support Services* [2002] UKHL 38; [2002] 1 WLR 2956.

[25] *Id.*

[26] Trust Agreement at p. 19 (§ 5.02) (emphasis added).

Interest in the amount to be distributed to Certificateholders on such Payment Date."[27]

The Trust Documents further provide that, while Trust Certificates are transferable, the transferee becomes the Certificateholder when it registers its interest with the Certificate Registrar.[28]  Moreover, the Trust Agreement provides that, prior to the transferee registering its ownership interest, the Certificate Registrar may make distributions to the existing Certificateholder instead of the transferee.[29]

In short, the Debtors argue that the Trust Documents specifically contemplate and address the very facts before the Court.  Strategic Mortgage purchased the Trust Certificate in August, 2007.  After purchasing the Trust Certificate, however, Strategic Mortgage failed to promptly register the Trust Certificate in its name in the Certificate Register.  The Record Date for the August Payment was August 31, 2007, and the Payment Date was September 25, 2007. Strategic Mortgage registered the Trust Certificate in its name on September 28, 2007 – approximately seven weeks after it purchased the Trust Certificate and after both the Record Date and the concomitant Payment Date for August.  Thus, American Home Investment is entitled to the August Payment.

---

[27] Trust Certificate at BSIL000103 (emphasis added).

[28] Trust Agreement at p. 9 (§3.03).

[29] *Id*. at p. 12 (§3.07).

Bear Stearns responds with three arguments.  First and foremost, Bear Stearns argues that entitlement to the August Payment is determined solely by the Repo Agreement.  That argument is discussed in detail below.[30]

Second, Bear Stearns argues that the Trust  Documents are ambiguous as to whether American Home Investment or Strategic Mortgage should receive the August Payment.  This argument is based on section 3.07 of the Trust Agreement, which provides that before a transferee registers its ownership interest the Certificate Registrar *may* make distributions to the existing Certificateholder instead of the transferee.  Bear Stearns argues that this section is inconsistent with the remaining provisions of the Trust Documents, which *require* the monthly payments be made to the registered holder of the Trust Certificate, and, thus, the Trust Documents are ambiguous.

The Court disagrees.  Section 3.07 is a standard "safe harbor" provision that makes it clear that the Certificate Registrar may rely on the registry in making the monthly payments - even though there are numerous provisions in the Trust Documents requiring the Certificate Register to do just that.  Like many safe harbor provisions, it is superfluous; but, in no way, is it inconsistent with the remaining provisions of the Trust Documents nor does it render those documents ambiguous.

Third, Bear Stearns argues that, since Bear Stearns International purchased "all right, title and interest" to the Trust Certificate through the Repo Agreement,

---

[30] *See* pp. 18-22, *infra*.

to award the August Payment to American Home Investment on the basis of Strategic Mortgage's "clerical error" in failing to register as the Certificateholder would provide the Debtors with an impermissible windfall. Bear Stearns further argues that the Court should invoke its equitable powers to prevent such a windfall.

The Court disagrees with both Bear Stearns's premise and its request for relief. As to the premise, Strategic Mortgage's failure to register as the holder of the Trust Certificate was not a clerical error. The act of registration is not simply a "clerical" act. Instead, registration is a legally significant act that facilitates the administration of large-scale security issuance involving multiple holders. A central feature contributing to a functioning securities market is that buyers and sellers do not have to identify beforehand the party that will be entitled to the next income payment. With respect to almost all types of securities (whether they are equity or fixed income, public or private, book-entry or physical), the paying agent is required to look only to the registered owner listed in the registrar's books on the record date before making payment. Departing from this practice – and requiring buyers and sellers to negotiate in each transaction for the right to the first subsequent income payment – would create confusion,

introduce uncertainty and ultimately reduce liquidity in the secondary securities markets.[31]

As to the requested remedy, Security Mortgage's failure to promptly follow these procedures, which are clearly reflected in the Trust Documents, does not warrant ignoring them. Authorizing American Home Investment to receive the August Payment does not, elevate "form over substance." To the contrary, it adheres to the substance of the Trust Documents, which require registration to protect the Certificate Registrar and to enable it to administer distributions.[32]

Equity cannot be used to rewrite the Trust Documents. As set forth above, these documents require that the monthly payments be made to the registered holder of the Trust Certificate. Despite Bear Stearns's dissatisfaction with these provisions, they cannot be rewritten on equitable grounds.[33]

---

[31] *See Jamie Sec. Co. v. The Limited, Inc.*, 880 F.2d 1572, 1573 (2d Cir. 1989) ("As is common large, widely-distributed securities issues, a record date was established to simplify the duties of the Trustee obligated to make the interest payments.").

[32] Bear Stearns cites to evidence that it argues indicates the parties did not intend for registration of the Trust Certificate to control entitlement to the monthly payments. Rather, Bear Stearns asserts that it requested American Home Investment to transfer the Trust Certificate to Bear Stearns International "in blank" because there was no Bear Stearns affiliate that was a REIT eligible to be a Certificateholder. This argument fails because the Trust Documents are not ambiguous as a matter of law and, thus, the evidence cannot be considered by the Court. *Rhone-Poulenc Basic Chem. Corp.*, 616 A.2d at 1195 ("The proper construction of any contract . . . is purely a question of law."); and *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991) ("[I]f the [contract] is clear and unambiguous on its face, neither [the appellate court] nor the trial court may consider parol evidence 'to interpret it or search for the parties' intent [ions]....'").

[33] *Adelphia Communications Corp. v. Rigas, et al. (In re Adelphia Communications Corp.)*, No. 04-2817, 2004 WL 2186582, Lynch, J., *12 (S.D.N.Y. Sept. 27, 2004) ("[I]f the Bankruptcy Court is going to use its discretionary equitable powers to exercise the fullest possible extent of its control over the debtor, it must first determine that, under the relevant contracts and applicable corporate or partnership law, it is awarding property only to those with a legitimate claim to it, and not using those equitable powers, in effect, to rewrite contracts and reorder property relations among non-debtor entities in a manner that is wholly unauthorized by the Bankruptcy Code. Failure to conduct such an inquiry is reversible error.").

Thus, based upon the application of the clear and unambiguous terms of the Trust  Documents identified above to the undisputed facts in this case, the Court finds that, because Strategic Mortgage did not register the Trust Certificate in its name in the Certificate Register until after the applicable Record Date and Payment Date, American Home Investment is entitled to the August Payment.

### III.   Neither the Repo Agreement Nor the Facts and Circumstances Surrounding the Repo Agreement Conflict With the Trust Documents, Which Provide American Home Investment is Entitled to the August Payment

Bear Stearns's primary argument is that the Repo Agreement controls which entity is entitled to the August Payment.  The Court disagrees.  The Repo Agreement is silent as to whether American Home Investment or Bears Stearns International is entitled to the payments.   Absent the expressed intent of the parties in the Repo Agreement that the clear and unambiguous terms of the Trust Documents are supplemented by the Repo Agreement, the terms of the Trust Documents must control.

Bear Stearns cites two provisions of the Repo Agreement in support of its argument.  First, Bear Stearns cites to Section 6(f) of the Repo Agreement, which provides that "all right title, and interest in and to Securities and money transferred or paid under this [Repo] Agreement shall pass to the transferee upon transfer or payment . . ."[34]  Second, Bear Stearns relies on section 5(i) of the Repo Agreement, which provides that in the event a monthly payment is made to Bear Stearns International it shall "transfer or credit to the account of

---

[34] Repo Agreement at p. 13 (§6(f)).

[American Home Investment] an amount equal to (and in the same currency as) the amount paid by the issuer."[35]

Bear Stearns's argument is straightforward.   Section 6(f) says what it means and means what it says.  The Debtors sold Bear Stearns International "all right title, and interest" in the Trust Certificate, including the right to receive the monthly payments.  Moreover, Bear Stearns argues that under section 5(i), until the Repo Agreement is terminated, Bear Stearns International is expressly entitled to receive the monthly payments, albeit it that it is then required to transfer or to credit to the account of American Home Investment an amount equal to the monthly payment.[36]

The Debtors respond by arguing that Bear Stearns's position is counter to the express terms of the Repo Agreement and the facts and circumstances surrounding the contract.[37]  The Court agrees with the Debtors.

Bear Stearns International's purchase of "all right title, and interest" in the Trust Certificate did not include the absolute right to the monthly payments.  Rather, Bear Stearns International's right to the monthly payment was contingent upon Bear Stearns International becoming the Certificateholder listed in the Certificate Register.  Stated differently, Bear Stearns International purchased the

---

[35] *Id*. at p. 11 (§5(i)).

[36] Bear Stearns further argues that the fact that American Home Investment received the monthly payments directly rather than through Bear Stearns International is of no moment because the parties agreed to transfer the Trust Certificate "in blank."

[37] Under English law, "it is always necessary for the court to consider the factual background to a commercial contract even if the wording of that contract might be regarded as unambiguous or sensible."  *See* pp. 11-13, *supra*.

ability to take steps to perfect its interest in the monthly income, i.e., the right to execute the  necessary transfer documents and present them to the Certificate Registrar, after which, if eligible, it would become the Certificateholder and, thus, would be entitled to the monthly payments under the terms of the Trust Documents.  Strategic Mortgage ultimately did just that when it became the Certificateholder on September 28, 2007, after which it became entitled to and actually received the monthly payments issued after that date.  This interpretation of the transaction comports with both the terms of the Repo Agreement as well as the Trust Documents because the former does not speak to entitlement to the monthly payments and the latter clearly limit distributions to registered Certificateholders.

Moreover, this interpretation is consistent with the facts and circumstances surrounding the Repo Agreement.  It is undisputed that American Home Investment was entitled to the monthly payments through July, 2007, and Strategic Mortgage is entitled to the monthly payments commencing in September, 2007.  So, what happened in the interim?  Two things.  First, the Repo Agreement was terminated. Second, Strategic Mortgage registered as the holder of the Trust Certificate.

Under Bear Stearns's argument, however, the former is of no moment because Bear Stearns already owned "all right title, and interest" in the Trust Certificate, including the right to receive the monthly payments.  This position is wholly inconsistent with the undisputed fact that the parties agree that the

Debtors were both entitled to the monthly payments through July, 2007 and actually received them directly from the Certificate Registrar.

Section 5(i), which provides that Bear Stearns shall transfer or credit the Debtors with the monthly payments is simply inapplicable. It only becomes relevant if Bear Stearns International receives distributions intended for American Home Investment. Since Bear Stearns International did not receive the August Payment, the provision does not apply. In addition, this provision does not address the right to receive the monthly payments but instead operates with another section (§6(h)) to enable the parties to setoff amounts they may owe each other under the Repo Agreement.[38]

That leaves Strategic Mortgage's registration as the holder of the Trust Certificate as the only intervening event between when American Home Investment and Strategic Mortgage were entitled to the monthly payments. Registration is only significant, however, if the parties intended that the Trust Documents would control entitlement to the monthly payments. Clearly, they did.

The Court finds that, under the clear and unambiguous terms of the Repo Agreement and the facts and circumstances surrounding that agreement, American Home Investment is entitled to the August Payment. The Repo

---

[38] Repo Agreement at p. 13 (§ 6(h)) ("Subject to [the occurrence of an event of default], all amounts in the same currency payable by each party to the other under any Transaction or otherwise under this Agreement on the same date shall be combined in a single calculation of a net sum payable by one party to the other and the obligation to pay that sum shall be the only obligation of either party in respect of those amounts.").

Agreement is silent as to whether American Home Investment or Bears Stearns International is entitled to the monthly payments; and, absent an expressed intent of the parties in the Repo Agreement to supplant the clear and unambiguous terms of the Trust Documents, the terms of the latter agreements must control. The Court has already held that those agreements entitle American Home Investment to the August Payment.[39]

## CONCLUSION

For the foregoing reasons, the Court finds that American Home Investment is entitled to the August Payment. Thus, the Court will grant the Debtors' motion for summary judgment and deny Bear Stearns's cross motion for summary judgment. An order will be issued.

Very truly yours,

Christopher S. Sontchi
United States Bankruptcy Judge

---

[39] *See* pp. 13-18, supra.